**13   CV   0833 A**



Revised 03/06 WDNY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

## FORM TO BE USED IN FILING A CIVIL COMPLAINT IN FEDERAL COURT
### (Non-Prisoner Context)

All material filed in this Court is now available via the **INTERNET**.  See **Pro Se Privacy Notice** for further information.

## 1. CAPTION OF ACTION

**A.      Full Name of Plaintiff:  NOTE:** *If more than one plaintiff files this action and seeks in forma pauperis status, **each** plaintiff must submit an in forma pauperis application or the only plaintiff to be considered will be the plaintiff who filed an application.*

Rinaldo Kay Moss

-vs-

**B.      Full Name(s) of Defendant(s) NOTE:** *Pursuant to Fed.R.Civ.P. 10(a), the names of all parties must appear in the caption. The court may not consider a claim against anyone not identified in this section as a defendant.*  Add a separate sheet, if necessary.

1. NICK BURT                                      4. Peter Constantzkes
2. Thomas Burno                              5. DAN HERBECK
3. Dale Smathers                              6. MATT SPINA

## 2. STATEMENT OF JURISDICTION, VENUE and NATURE OF SUIT
### All of these sections **MUST** be answered

*Identify the basis for federal Court jurisdiction over your claim, such as that the United States government is a party to the action, all the parties reside in different states and therefore you claim diversity jurisdiction, or the claim presents a federal question or arises under federal law.*

A. Basis of Jurisdiction in Federal Court: The claim presents a federal question and arises under federal law

*State why the Western District of New York is the proper venue for this action, such as that your claim arises in or the defendant resides in the 17 westernmost counties of New York State.*

B. Reason for Venue in the Western District: The claim arises in the Western District of New York. Also all of the defendant's reside in the 17 counties

*Identify the nature of this action, such as that it is a civil rights claim, a personal injury or personal property (tort) claim, a property rights claim, or whatever it is.*

C. Nature of Suit: Civil Rights claim and personal injury DEFAMATION of CHARACTER cliam, Discrimination claim

## 3.  PARTIES TO THIS ACTION

**PLAINTIFF'S INFORMATION  NOTE:** *To list additional plaintiffs, use this format on another sheet of paper.*

Name of First Plaintiff: Rinaldo Ray Moss

Present Address:

Name of Second Plaintiff:

Present Address:

**DEFENDANT'S INFORMATION  NOTE:** *To list additional defendants, use this format on another sheet of paper.*

Name of First Defendant: Nick Burt

Official Position of Defendant (if relevant):

Address of Defendant:

Name of Second Defendant: Thomas Buono

Official Position of Defendant (if relevant):

Address of Defendant:

Name of Third Defendant: Dale Smithers

Official Position of Defendant (if relevant):

Address of Defendant:

## 4.  PREVIOUS LAWSUITS IN STATE AND FEDERAL COURT

A.   Have you begun any other lawsuits in **state or federal court** dealing with **the same facts involved in this action**?

Yes____  No ✓

If Yes, complete the next section.  NOTE: *If you have brought more than one lawsuit dealing with the same facts as this action, use this format to describe the other action(s) on another sheet of paper.*

1.   Name(s) of the parties to this other lawsuit:

Plaintiff(s):

DEFENDANTS INFORMATION

NAME OF FOURTH Defendant   PeTer Constantakos
official Position of Defendant
Address of Defendant

NAME of Fiveth Defendant     DAN HERBECK
Official Position of Defendant
 Address of Defendant

NAME OF SXTH Defendent     MATT SPINA
Official Position of Defendent
Address of Defendant

Defendant(s): _N A_____

_____ N A _____

2.  Court (if federal court, name the district; if state court, name the county): _N A_____

_____

3.  Docket or Index Number: _____ N A _____

4.  Name of Judge to whom case was assigned: _____ N A _____

5.  The approximate date the action was filed: _____ N A _____

6.  What was the disposition of the case?

  Is it still pending? Yes____ No __✓__

  If not, give the approximate date it was resolved. _N A_____

  Disposition (check those statements which apply):

  _N A_ Dismissed (check the statement which indicates why it was dismissed):

    _N A_ By court *sua sponte* as frivolous, malicious or for failing to state a claim
    upon which relief can be granted;

    _N A_ By court for failure to prosecute, pay filing fee or otherwise respond to a
    court order;

    _N A_ By court due to your voluntary withdrawal of claim;

  _N A_ Judgment upon motion or after trial entered for

    _N A_ plaintiff
    _N A_ defendant.

---

### 5. STATEMENT OF CLAIM

**Please note** that it is not enough to just list the ground(s) for your action. You **must** include a statement of the facts which you believe support each of your claims. In other words, just tell the story of what happened and do not use legal jargon.

**Fed.R.Civ.P. 8(a)** states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "The function of pleadings under the Federal Rules is to give fair notice of the claim asserted. Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial." Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995).

**Fed.R.Civ.P. 10(b)** states that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far a practicable to a single set of circumstances."

---

**A. FIRST CLAIM:** On (*date of the incident*) _Jan. 26th 2013_____,

defendant (*give the **name and (if relevant) the position held** of **each defendant** involved in this incident*) _Thomas Bueno, boy friend of Katherine Goodman white daughter of deceased un known what position Thomas Bueno holds to the knowledge of Plaintiff_

3

did the following to me (*briefly state what each defendant named above did*): AT MR. Bueno's invitation he allowed a Reporter, photographer and videographer from the Buffalo News accompanied him during a search of the funeral home in which I worked, without Authorization from the fire department or anyone else for that matter putting the lives at stake of himself and all other's concerned Being that the United memorial and Mass Funeral Home was completely destroyed in an accidental fire, Two firefighters almost lost their lives

The federal basis for this claim is: DEFAMATION OF CHARACTER, humiliation, mental anguish, distressed, discrimination, deliberate indifference to my profession

State briefly **exactly** what you want the Court to do for you. *Make no legal arguments and cite no cases or statutes:*

I was 20 years old when I started my profession the youngest black mortician in Buffalo. I would like MR. Bueno to compensate me for the loss of my Reputation, MR.Bueno has greatly limited Plaintiff's ability as a mortician.

**B. SECOND CLAIM:** On (*date of the incident*) Jan. 26th 2013

defendant (*give the name and (if relevant) position held of each defendant involved in this incident*) Nick Burt a Buffalo demolition contractor

did the following to me (*briefly state what each defendant named above did*): MR. Burt, headed a Search party without any Authorization from the fire department of the United memorial and Mass funeral Home, which was completely destroyed in an accidental fire in which Two firefighters almost lost their lives putting his life and the lives of other in danger and at risk of death at any given second inside of a burned out building that MR. Burt, was hired to demolish not lead a search party

The federal basis for this claim is: DEFAMATION OF CHARACTER, humiliation, mental anguish, deliberate indifference to my profession, discrimination against Plaintiff's age

State briefly **exactly** what you want the Court to do for you. *Make no legal arguments and cite no cases or statutes:*

As I stated Plaintiff would like to be compensated by MR. Burt for lost of employment due to his false allegations against Plaintiff in the Buffalo News, Also for Plaintiffs in ability as a mortician to get hired because of MR. Burt slander against Plaintiff

**If you have additional claims, use the above format to set them out on additional sheets of paper.**

C. THIRD CLAIM: On (date of the incident) Jan. 26ᵗʰ 2013 defendant (give the name and (if Relevant) position held of each defendant involved in this incident) Dale Smathers

MR. Smathers, serves as Vice president of the Greater Rochester Funeral Consumers Alliance and a former funeral director.

did the following to me (briefly state what each defendant named above did): MR. Smathers, slandered my name and Reputation throughout the Buffalo, Newspaper, Effecting plaintiff's livel. hood to feed and support plaintiff's family. MR. Smathers, being a former funeral director knows the facts about Authorization for cremation and Disposition.

MR. Smathers, eventough he stated in the Buffalo, News paper that he is aware of the fact that many situations the family never bothers to pick up the Remains of a loved one. Sometimes leaving the remains with a funeral director for years, even decades. MR. Smathers, was very bias and prejudice toward plaintiff to the point I was receiving harassing, threatening phone calls stating plaintiff was in fact holding their family members hostage, when that was not the case at all and for MR. Smathers to insult plaintiff, CHARACTER AS MR. Smathers did plaintiff might not ever Recover plaintiff's good standing throughout the Buffalo community or any community with this matter. Plaintiff, has experienced such a cruel and Reckless attack on plaintiff profession as a young, let me Re-state this sentence, the youngest African-American funeral director in Buffalo. N.Y. Plaintiff, suffers greatly due to MR. Smathers. viscous attack on plaintiff's character.

D. FOURTH CLAIM: On (date of the incident) Jan. 26th 2013 defendant (give the name and (if relevant) position held of each defendant involved in this incident) Peter Constantakes, is a funeral director in Buffalo N.Y.

did the following to me (briefly state what each defendant named above did): MR. Constantakes, attacked plaintiff's obligation as a funeral director stating in the Buffalo Newspaper, this case is different the Goodmans said they wanted the cremains but could not get them as if plaintiff was holding the cremains of the Goodman's family hostage. Again, MR. Constantakes enabled plaintiff, as a husband and a father of three young children plaintiff has struggled to get where I was in life. MR. Constantakes, has been bias and prejudice towards plaintiff. Using discrimination against plaintiff's age and character. MR. Constantakes, evaluation in the Buffalo, Newspaper of plaintiff was a uncaring, viscous attack of the lack of knowledge that MR. Constantakes, has of plaintiff as a funeral director and human being.

E. FIVETH CLAIM: On (date of the incident) Jan. 26th 2013 defendant (give the name and (if relevant) position held of each defendant involved in this incident) DAN HERBECK, MR. HERBECK is a News STAFF REPORTER, for the Buffalo, News paper.

did the following to me (briefly state what each defendant named above did): MR. HerBeck, published and showed plaintiff's picture on T.V. and Ran the false story against plaintiff and enter the burned out Building of the funeral

continue, E. fiveth CLAIM',
home without Authorization from the fire department or
anyone but MR. But. and MR. Buono, who in fact had no
Authorization to enter the funeral Home. Two fire-
fighters almost lost their lives putting out the fire
However, or whatever they thought was in the funeral
home. All of their lives was put in danger and death
upon them being that MR. HERBECK, was so thirsty for a
news story MR. HERBECK, broke all rules in order to do so
as most news staff reporter's and in the process just don't
care about human lives or their own, Ruin plaintiff's
profession as a mortician, was in fact bias and prejudice
towards plaintiff and discriminated against plaintiff
airing picture of plaintiff on T.V news and the newspaper
article he wrote against plaintiff.

F. SixTH CLAIM: On (date of the incident ) Jan. 26th 2013
defendant ( give the name and (if Relevant ) position held of each
defendant involved in this incident )  MATT SPINA, MR. SPINA, is a
News STAFF REPORTER, for the Buffalo, Newspaper.

did the following to me ( briefly state what each defendant named
above did ): MR. SPINA, a long with his co-worker MR. HERBECK
did in fact made a viscous attack upon plaintiff's
character put picture of plaintiff on the T.V. news as if
Plaintiff, was wanted for holding families loved one's
hostage when MR. SpINA, did not have facts or knowledge
of the situation at all. Posting plaintiff's personal business
on the internet for all to view. MR. SpINA, did in fact
make a direct insult to plaintiff's character and as a
African - American was bias and prejudice towards plaintiff.

MAY,

I, Plaintiff Rinaldo Ray Moss, proceeding pro se present to the court this Newspaper article intitled odds as a supporting exhibit to my civil 1983 suit.

Also in support a copy of Authorization for Cremation and Disposition form which plaintiff will make copies for the court and defendants in this matter

### 6. SUMMARY OF RELIEF SOUGHT

*Summarize the relief requested by you in each statement of claim above.*

I would like to be compensated among all defendants with $750,000 dollars for bias, prejudice, discrimination against Plaintiff. Also for Mr. Herbeck and Mr. Spina to write an open apology in the Buffalo Newspaper and T.V apologizing for their error of Plaintiff character.

Do you want a **jury trial**? Yes ✓ No ____

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on 08 / 14 / 13

(date)

**NOTE:** *Each plaintiff must sign this complaint and must also sign all subsequent papers filed with the Court.*

_____

Signature(s) of Plaintiff(s)



Odds



# AFD Profile
By Tanya Kenevich

Rinaldo Moss is a respected funeral director, having owned the
United Memorial and Moss Funeral Home, the largest African-
American funeral home in Buffalo, N.Y. He lives with his beautiful
wife, Marie, and their three children: Eight-year-old Rayna, two-
year-old Raymond and baby Rayna. Moss seems to live a great life
now, but it was certainly not handed to him – and he worked hard to
become the man he is today.

Moss grew up in Buffalo, born into a world of drugs and crime. His mother and father were what Moss called "street people" and were drug addicts growing up. Moss remembers his mother being a sort of "professional shoplifter," stealing merchandise to sell since she was 12 years old. Drugs and crime consumed her, and she spent much of her life in and out of jail and rehab. Moss's father, although having part in some legitimate businesses, dealt drugs on the side for additional income.

"My mother and father, they separated when I was young. It was a very violent relationship between them two. My father used to beat my mom; my mom would lash out at my father. My father, he stabbed my mother one time. She only has one lung. My stepmother shot my father in the chest; I saw that, too, but I can't really remember it; I was five," Moss said.

# Overcoming the

> ❝ I don't do funeral service for the money; I do it because I can do it. ❞ - Rinaldo Moss

Interestingly, one of the businesses that Moss's father invested in was the profession that Moss would eventually enter. "My father invested into a funeral home back in the '70s, so that's sort of how I kind of got interested," he said. "He gave me something different to look forward to other than being in the streets."

Nevertheless, drugs became a focal point of Moss's parent's lives. "I was born in '79. Crack hit here pretty heavy in Buffalo around about '86, but my dad was already supplying stuff," he said. "But they didn't call it crack then; they called it 'freebase,' and you would smoke it."

Because of his mother's dangerous crack habit, she would often go missing from their home, and Moss would desperately try to find her in local crack houses. "It was kind of rough, but my attitude kind of had changed when I was about maybe 12. My attitude kind of changed for the worse," Moss said. "My father wasn't around, my mother wasn't there to nurture me, so I thought

something was wrong with me. I was really withdrawn."

As it is with many children of parents who are involved with drugs, Moss and his half brother Ray Ray started to sell drugs on the street for money. "I didn't want to be involved in a lot of things I ended up being involved in later in my life, but that's all I had seen," he said. Moss would also have to pay the bills at the age of 12, simply because his mother would be smoking crack – and be completely unaware that the lights had been turned off in the house by the electric company.

Although Moss's mother would not let him participate in any school sports, she allowed him to go to karate classes. Moss immersed himself into his lessons and practicing; he saw it as a way to escape his life, if only for a short while. It also made him a strong opponent for any schoolmates that said anything derogatory about his family. However, Moss's anger and temper got him suspended every year from fifth grade to his senior year of high school. Eventually, these fights led to expulsion.

Moss decided to leave Buffalo and moved to Atlanta to live with his sister – but this would not be the true escape that Moss was looking for. His sister, gripped by jealously, had felt that their mother always favored Moss, and she

released her frustration by beating him. "She would beat me, she barely kept food in the house, there were no Christmases, no birthdays, no school clothes, none of that. She would just be real mean and real crazy," Moss said.

After a few years, Moss's sister kicked him out of the house, and he had no choice but to return to Buffalo. His mother, who was clean from drugs at the time, got an apartment. Moss returned to school but he soon realized that drugs had become extremely prevalent in Buffalo. Eventually, his mother relapsed, and Moss spent much of his life in the street, hanging out with gangs.

When Moss was 16, his mother was arrested for murdering her landlord, a crime that Moss vehemently denies she was involved in. She is still in jail to this day. At the age of 16, Moss became emancipated from his parents, had no money and no real place to call home. "There was McDonald's (where he and his friends hung out), and I would legitimately put in an application every day, *every day*, I would go job hunting, because I never wanted to sell crack," Moss said. "I saw what it did to my mother, I saw how it destroyed my family with my father, and I just looked at things differently."

No one would give Moss a job and he had no way to support himself. Going against what he believed in to

simply survive, he moved to uptown Buffalo and started to sell drugs – barely feeding himself on food stamps. Moss's father eventually let him sell drugs inside his father's own crack house with Ray Ray. Moss wasn't proud of this, but at the time, it was the only way to survive.

## A New Direction

Things changed for Moss one summer when he found out about a school program where young students do homework and take classes. Moss scoffed at the idea of using summer for homework, but he decided to try it – if only just to meet some of the pretty girls in the program.

And contrary to popular belief from Moss's teachers, he was extremely intelligent. "I would slack off all year, pay attention at the end of the year and ace all the finals," he said. But since Moss was a troublesome kid, his teachers never put in any time to guide him in a better direction.

After some coaxing from his mother, Moss decided to enter the school program for the summer. "It showed me something different, other than violence and fighting and things like that," he said.

One class in particular changed Moss's entire life. The class, which was focused on Wall Street stocks and bonds, was one of Moss's least



**New Construction? Remodeling?**

Don't forget about your furnishings. A.C. Furniture offers custom furniture such as wing back chairs, sofas, benches, stacking chairs and occasional tables in a wide range of fabrics and finishes.

Please call or fax your request for a binder that includes brochures featuring color photos of all our available products, price lists and fabric cards.

A.C. Furniture Company Inc.
P.O. Box 200, Axton, VA 24054
276-650-9359 · Fax 800-416-4590
www.acfurniture.com

favorite classes. One day, however, the teacher asked the class, "If you had X amount of dollars, give me two businesses you guys would invest in." The class had to write a small explanation of the businesses that they would invest in, and why, and then they would read it to the class.

Moss got up, exasperated, and told the class that he would invest in either a funeral home or a movie theater. "(The teacher) looked at me very strange," Moss remembered. "He said, 'You have a real strong mind, son. I didn't expect that from you. You would really go into a funeral business?'"



**Photo:** The Moss Family (from left): Son Raymond, Rinaldo, daughter Rayna, wife Marie and son Raymar. *(Photo courtesy of Dana Richie Photography)*

"Yes, I would go," Moss answered, and explained the history of his father's investments in the local funeral home.

His teacher was intrigued and explained to Moss that the mortuary science program was only two years and that it was a steady business. "After that, he kind of took to me," Moss said. Moss continued to keep his grades up and became more involved in the program.

Moss's father, who had just gotten clean off drugs, asked Moss where he was going to go to school after he graduated high school. Moss mentioned that he was thinking about mortuary school. "That's funny that you should say that," his father said. "I'm actually trying to get into another business deal with another funeral home."

Although Moss flip-flopped on the idea of going to mortuary school, he was told by his friends, who were dealing drugs at the time, to go back to school. His financial aid was even taken care of through the summer education program. After some thought, he eventually enrolled himself at the State University of New York at Canton.

The campus of the rural college was a huge culture shock for Moss, as predominately white and male students attended the college. "There were no women up there, there were no cars up there ... the only thing there was to do was study mortuary science," he said.



# Are families demanding more customised looking caskets?

# Why not give it to them?

*Lid Centrepieces—Panel Adornments—Handle Embellishments*

## WWW.CASKETACCENTS.COM

In his sophomore year, Moss even doubled up his classes in order to graduate on time – with honors. "I ended up becoming the president of the Mortuary Science Association (at college)," Moss said. "It was a totally different outlook now."

However, during college, he had found out that his best friend, Maurice, had suddenly died in his sleep. With everything that Moss had gone through in his life, and now with his best friend gone, he realized that if he was going to survive, he couldn't live his former life anymore. "Either I'm going to change, or I'm going to die trying to," he said to himself.

## A Rough Start

After Moss completed college, he returned home to Buffalo, excited to start his life anew. Unfortunately, he found it difficult to get his first job. "I came home ready to conquer the world! I got my degree in two years. I was 20 – the youngest black mortician in Buffalo – and I couldn't get a job," Moss said. To add insult to injury, Moss found out that his father had not invested in the funeral home that he had been telling his son about all through his schooling. Moss was shocked and betrayed by his father's lie, and wasn't sure what the next step was for his career or his life.

After much searching, Moss found a job opening for an intern at Thomas T. Edwards Funeral Home in Buffalo. The funeral home had too many cases and was terribly understaffed, and since Moss was very educated in mortuary science and knew his way around a good embalming, he was offered a job there. "The funeral home did about 300 cases a year. We did all our own removals, casketing, embalming, everything. We didn't call anybody else," Moss said.

But everything changed for Moss on one fateful day. "I was sitting at the funeral home, getting ready for a funeral. It was about 8:30 a.m., Sept. 11, 2001," he said. "We had a little TV in the cabinet and I was watching the news and then a plane flew into the twin towers. I didn't think it was real. I thought that some dumb pilot flew the plane into the twin towers. Then all of a sudden, the other one hit later. Everyone was calling the funeral home and something just came over me."

Moss's blood boiled with anger from the situation he was watching on the TV, and with his father being a Marine and other relatives having served in the military, he knew what he was destined for. "I've been a fighter all my life, and now I have a skill: I'm a mortician. So I went to the recruiting office." Moss signed himself up in November 2001, for three years in the Army. He became a mortuary affairs specialist in the 54th Quarter Master Company and was eventually involved in the 4th infantry division while in Iraq.

During Moss's time in service, he ended up in Fort Lee, Va., and was then deployed to Germany for about five months, helping with mortuary practices. "In the meantime, in the service, I ended up marrying my wife (Maria).





No more redundant entry of information! cafe systems cut down the time spent on data entry, significantly freeing up our time.

Buddy Phaneuf - Phaneuf Funeral Homes & Crematorium

## Our clients are spilling the beans about cafe systems

Introducing the hottest new product for the funeral and cemetery industry from the company that is recognized as the BEST cemetery and mortuary software solution provider in the industry - HMIS, Inc.

- Customized packages designed to reduce costs
- Web-based and security hosted
- No network hardware required
- Data backups included
- Low monthly rental option!

CAUTION! HOT!

café
cemetery, crematory and funeral home enterprise

HMIS

Call for a demo. A FREE online demo of cafe systems.

Learn more online at www.hmisinc.com/products/cafe or call (888) 891-4647

AWARD-WINNING
MOONLIGHT MEMOIRS

An exquisitely illustrated, uplifting story reminding us that love remains with us, no matter what happens to our loved ones.

Two young mice venture into moonlit seas where they meet an older mouse who, along with other animal friends, teaches them about the eternal nature of love.

A welcomed addition to your children's rooms. $14.95 Hardbound - Amazon, Barnes & Noble Quantity Discounts Available at website

www.moonlight-memoirs.com

She was pregnant, and she was very supportive of me. She's been there with me the whole time. She gave me motivation to do something different. I wanted to make sure my children wouldn't go through the same things that I went through," Moss said.

He was brought back home just in time to see his first son, Raymar, born. He was then deployed to Iraq and helped with search and recovery missions. "I learned about excavations, mass burials, disaster mortuary death teams, but they didn't know how to embalm. I was a specialist (for embalming)," Moss said.

When Moss's tour was finally over and he returned home, he was faced with an unpleasant situation: His former job at the funeral home was gone. Frustrated, Moss started to collect unemployment, and his wife did telemarketing to make ends meet. He moved his family into a house that he had lived in with his brother when he was younger. Moss started to do trade work for funeral homes and even started selling cars with his brother. "Luckily, I landed an assistant management job at Memorial Chapels of Buffalo with Charles Simmons," Moss said. "Mr. Simmons taught me how to do arrangements and deal with families because I was lacking in that area of funeral service. Embalming and everything, I had that down pat. I did so many bodies within that short period of time."

### The Pieces Come Together

While Moss was working in the trade, he found out that the former manager at United Memorial Funeral Homes in Buffalo had left the business. Moss's godfather, Roland, ran the funeral home at the time. United Memorial was interested in Moss's talents, but Moss refused to leave his job unless he was offered an ownership stake in the United Memorial business. But sadly, Roland passed away. His widow called Moss and told him that Roland said in the past that if he died, he wanted Moss to do his service. Moss wasn't sure he could handle it, but because it had

Photos: The United Memorial and Moss Funeral Home in Buffalo, N.Y., was completely destroyed in an accidental fire on Jan. 1, 2011. *(Photos courtesy of WIVB-TV, www.wivb.com)*

been so important to Roland, he embalmed his godfather himself and ran the entire service as a final gift to Roland.

"I did the service; it was a very stressful service," Moss remembered. "The president (of the funeral home) at the time saw my work and I told him, 'You don't owe me anything; this was my godfather. It was an honor for me to do the work for him. You don't have to pay me for the services.'"

Although Moss might not have been paid for the service, the funeral home was still staying busy with calls every day – and Roland, the business's star embalmer, was now deceased. Moss went into negotiations and even took additional business classes to learn the inner workings of how a funeral home operates. "We worked out an installment process with the mortgage, with the building, things like that," he said.

After some serious negotiations, Moss eventually became president of the United Memorial and Moss Funeral Home. "After all of the work, the headache, the disappointments and the letdowns, everything came back together," he said. "I was trying and struggling for 10 years to get my own funeral home. For 12 years, I would just say to myself, 'I'm going to get a funeral home. I'm going to live a normal life and raise my family the right way.' That's the only thing I ever really wanted to do."

Moss added, "Funeral service gave me a sense of fulfillment and a sense of worth, a sense of being within society. I knew what it was like to be destructive, but I never knew what it was like to be there for someone in (his or her) time of need."

### Rising from the Ashes

Moss had only been president of the funeral home for 10 months until







Jan. 1, 2011, when the funeral home was completely lost in a six-alarm fire. Two firefighters almost lost their lives in the inferno.

"I thought someone had set the funeral home on fire and I was very, very upset," he said. "I went into my own little shell, and I just stayed in the house for a couple of days. I didn't even talk to my wife a lot. We were waiting for all the investigations, and I still didn't know what was going on. Because I'm the

president of the corporation but I didn't own the funeral home or the assets, I was still making payments on it. I had only been making payments for 10 months," Moss said. A full investigation found the fire to be accidental.

However, talk of the fire started a media blitz. Various news stations were interviewing Moss about the fire and his plans for his business. "I was in shock. At first I thought the fire department would be able to put it out quickly because they have a firehouse right across the street. But when they opened up the windows to put out the fire I guess the oxygen mixed with the flames and caused a back draft throughout the whole building," Moss said in a report by WGRZ-TV.

Moss also mentioned that he was reaching out to various funeral homes so he could continue to take care of his clients. The Lombardo Funeral Home was one of the funeral homes gracious enough to offer its facilities to Moss so he could continue to conduct business.

Moss had been leasing the United Memorial and Moss Funeral Home, so the insurance on it will be paid to the owner. Moss continues to wait until all of the insurance issues are taken care of and is operating out of another firm. "The firm that I am leasing out right now is Lombardo Funeral Home," he said. "(Joe) Lombardo, he's an Italian gentleman who has about five funeral homes in the western New York area. He does a lot of services for the African-American community."

Lombardo had contacted Moss when he read about the fire in the paper and how Moss said that it was important to him for funeral homes to work together for their communities. "(Lombardo) called me and we sat right here at the funeral home and we had a lot of things in common," he said. "He felt the same way as me. His grandfather had started the funeral home and his grandmother was the first woman funeral director in Buffalo, so his family was into funerals a lot and he offered a helping

hand in the midst of the fire."

Lombardo has also made a few offers to Moss, including Moss buying one of the Lombardo Funeral Home locations or becoming a partner, bringing two communities together. "We are trying to offer the community here in Buffalo a different type of funeral service and make it affordable for the people," Moss said. And although Moss is pretty confident that the partnership will go through, "I just have to see how the payments and everything work out," he said. "Hopefully me and Joe Lombardo can come together and get things kicked off with what we've been talking about. But everything is

subject to change, still. Everything is tentative."

No matter what the outcome is with Moss and the Lombardo Funeral Home, Moss's future in funeral service is nowhere near over. "I don't do funeral service for the money; I do it because I *can* do it. God gave me this gift," he said. "I think out of all the things I have been put through, it made me a little desensitized. I'm not too in touch with my emotions, but I can deal with death and bereavement. I have sympathy for the families and I feel like you can lean on me because I am strong and I can help you get through that situation that you're going through at that time." v







BACH PLANNING & DESIGN

Interior Design for the Funeral Home Environment

I believe that the funeral home environment is an essential part of the healing journey.

Cindy G. Bach, LLLD AP, CID, LDAC

www.BachPlanningDesign.com
763-360-4502 • CBach@bachplanningdesign.com

QUALITY,
SERVICE &
REPUTATION
SINCE 1993

Timeless Memories
Keepsake Wristwatch

madelyn
COMPANY

KEEPSAKE PENDANTS

# *Authorization for Cremation and Disposition*

NYS Department of State
Division of Cemeteries
One Commerce Plaza, 99 Washington Avenue
Albany, NY 12231
(518) 474-6226
www.dos.ny.us

**This Authorization Form must be completed and signed prior to delivery of remains for cremation.**

Date:_____   Number:_____

Crematory Name:_____

Address:_____   Phone:_____

---

**CREMATION IS AN IRREVERSIBLE AND FINAL PROCESS.**
Cremation is carried out by placing the remains of the deceased and the container holding the remains into a cremation chamber where they are subjected to intense heat and flame. **The heat and flame will incinerate and consume everything except bone and metal, which are all that will be left after cremation.**
Following cremation, the crematory will take reasonable efforts to remove all of the remains and other material from the cremation chamber, but some minimal dust and residue will likely be left behind. The crematory will separate incidental and foreign material from the remains and the incidental and foreign material will be disposed of as required by law. The cremated remains will be mechanically pulverized into small pieces and placed into a designated container or urn. **Cremated remains generally are pulverized until no single fragment is recognizable as skeletal tissue.**

---

**OPENING OF CONTAINER**
The crematory may only open the container holding the un-cremated human remains in limited circumstances,  such as to confirm the identity of the deceased or to ensure that no material is enclosed which might injure  employees or damage crematory property. **If human remains are delivered in a container which is not  suitable for cremation such as a ceremonial or rental casket, the crematory will require that the remains  be moved into a suitable container before it accepts the remains.** The opening of a container or the transfer or removal of remains will be conducted before a witness and will be done in privacy, with dignity and respect.

**IDENTIFICATION OF DECEASED**

Name of Deceased:_____   Marital Status:_____

Last Known Address:_____

Place of Death:_____

Sex: ☐M ☐F   Age:_____   DOB:_____   Date of Death:_____   Estimated Weight:_____

Description of casket/container in which remains will be delivered:

---

**PERSON IN CONTROL OF DISPOSITION**

*(Person(s) in control of disposition, initial ONE of the following)*

_____  I am/ We are the designated agent of the deceased designated in a will or written instrument executed pursuant to Public Health Law section 4201.

-OR-

_____  I/We have no knowledge that the deceased executed a written instrument pursuant to Public Health Law section 4201 or a will containing directions for the disposition of his or her remains and  *(Continued next page)*

---

I am/ we are the person(s) having priority under Public Health Law section 4201 and have the right to authorize cremation of the remains of the deceased.  **My/Our relationship to the deceased is as follows:**

*(Insert from the list below)*

Number:_____   Description:_____

> **1.** A person designated in writing pursuant to Public Health Law section 4201(3);
>
> **2.** The surviving spouse;
>
> **2a.** The surviving domestic partner;
>
> **3.** Any surviving child eighteen years of age or older;
>
> **4.** A surviving parent;
>
> **5.** A surviving sibling eighteen years of age or older;
>
> **6.** A lawfully appointed guardian;
>
> **7.** Any person(s)  eighteen years of age or older entitled to share in the estate and who is/are closest in relationship to the  deceased;
>
> **8.** A duly appointed fiduciary of the estate;
>
> **9.** A close friend or relative who has executed a written statement pursuant to Public Health Law §4201(7);
>
> **10.** A chief fiscal officer of a county or a public administrator appointed pursuant to the Surrogate's Court Procedure Act;
>
> **10a.** Any other person who is acting  on behalf of the deceased and who has executed a written statement pursuant to Public Health Law §4201(7).

*(Initial ALL THREE of the following)*

_____ I/We hereby affirm that the body of the deceased does not contain a battery, battery pack, power cell, radioactive implant, or radioactive device and that any such materials were removed prior to the execution of this Authorization Form. **Failure to remove these items prior to cremation may result in harm to the crematory and crematory personnel.**

_____ I/We hereby affirm that instructions have been given to *(funeral director name)* _____ regarding the removal of any personal property or other thing of value which any person signing  below or any family member of the deceased wishes to preserve.  *(crematory name)* _____ is not responsible for removal of personal items from the container or from the remains of the  deceased. **Personal items left in the container or with the remains will be destroyed by the cremation process and cannot be retrieved after cremation.**

_____ **I/We hereby authorize** *(crematory name)*_____ **to cremate the remains of the deceased.**

## FINAL DISPOSITION

The person authorized to receive the cremated remains of the deceased from the crematory is:

Name:_____

Address:_____   Phone:_____

The cremated remains of deceased will be disposed of as follows:

_____

If for any reason the person named above does not take possession of the cremated remains,

*(crematory name)* _____ is authorized to give possession of the remains to

*(funeral home name)* _____ by  delivery in person or by registered mail.

*(Initial the following)*

_____ I/We understand that if the remains are not claimed within 120 days of cremation, (crematory name) _____ may dispose of the remains in an irretrievable manner, such as by scattering.

## CREMATION CONTAINER/URN

*(Initial ONE of the following)*

_____ An urn to be used as a container for the cremated remains has been purchased from _____ and is described as follows:

_____.

I/We understand that if the urn is too small to hold the entire cremated remains, an additional rigid container may be used for delivery.

*-OR-*

_____ An urn has not yet been purchased.  I/We understand that if no urn is purchased or otherwise provided (crematory name) _____ will place the cremated remains in a rigid temporary container for delivery.


This Authorization Form was provided by *(funeral director name)* _____, was executed at *(funeral home name)* _____, *(funeral home address)* _____ and is signed by  the funeral director as witness to its execution.


I/We have received a completed copy of this Authorization Form.

**The person(s) identified below is/are the person(s) in control of disposition, who by signing this Authorization Form, attest(s) to the accuracy and completeness of the information contained in this Authorization Form and authorize(s) the foregoing.**

**Signed this _____ day of _____, 20_____.**

| | |
|---|---|
| *Typed or Printed Name* | *Signature* |
| *Address* | |
| *Typed or Printed Name* | *Signature* |
| *Address* | |
| *Typed or Printed Name* | *Signature* |
| *Address* | |

## WITNESS:

| | |
|---|---|
| *Funeral Director Typed or Printed Name* | *Funeral Director Signature* |
| *Registration Number* | |